United States District Court
District of Connecticut

Robert Dixon
Inmate # 308241
MacDougall Correctional Institute
1153 East St. South
Suffield, CT. 06080

Civil No. 3:30-CV-01754 (VLB)

Dated: January 27, 2021

Jury Trial Demanded

vs

① Dr. Francesco Lupis
1153 East St. South
Suffield, CT. 06080

② Nurse Gwen Hitte
1153 East St. South
Suffield, CT. 06080

First Amended Complaint

③ Nurse Lisa Candelario
1153 East St. South
Suffield, CT. 06080

④ Holly Good
1153 East St. South
Suffield, CT. 06080

⑤ Kristine Barone
1153 East St. South
Suffield, CT. 06080

⑥ Rose Walker
1153 East St. South
Suffield, CT. 06080

⑦ Ian Wellington
263 Farmington Ave.
Farmington, CT. 06032

⑧ Correction Officer
R.D. Griswold
1153 East St. South
Suffield, CT. 06080

⑨ Nurse Bonnie
1153 East St. South
Suffield, CT. 06080

## Parties:

1. At all times herein mentioned the plaintiff, Robert Dixon (Dixon), is and was an inmate, #308241, incarcerated within and for the state of Connecticut (the state), in the custody and care of the Department of Correction (D.O.C.), being housed at the MacDougall Correctional Institute (MacDougall).

2. At all times herein mentioned the defendant, Francesco Lupis (Lupis), is and was a medical staff member of the D.O.C. providing medical care services to inmates at MacDougall, as a doctor; and is sued herein in an individual and official capacity.

3. At all times herein mentioned the defendant, Nurse Gwen (Gwen), is and was a medical staff member of the D.O.C. providing medical care services to inmates at MacDougall, as a nurse; and is sued herein in an individual and official capacity.

4. At all times herein mentioned the defendant, Nurse Lisa (Lisa), is and was a medical staff member of the D.O.C. providing medical care services to inmates at MacDougall, as a nurse; and is sued herein in an individual and official capacity.

5. At all times herein mentioned the defendant, Holly Good (Good), is and was a medical staff member of the D.O.C. providing medical care services to inmates at MacDougall, as a nurse and Patient Prioritization and Treatment (P.P.T) scheduling coordinator; and is sued herein in an individual and official capacity.

6. At all times herein mentioned the defendant, Kristine Barone (Barone), is and was a custody staff member of the D.O.C. providing medical care services to inmates at MacDougall, as Warden responsible for the treatment and care of inmates at MacDougall; and is sued herein in an individual and official capacity.

7. At all times herein mentioned the defendant, Rose Walker (Walker), is and was a medical staff member of the D.O.C. providing medical care services to inmates at MacDougall, as a nurse and Health Services Review Coordinator (HSRC); and is sued herein in an individual and official capacity.

8. At all times herein mentioned the defendant, Ian Wellington (Wellington) is and was a medical staff member of UConn, providing medical care services to inmates at MacDougall, as an orthopedist; and is sued herein in an individual and official capacity.

9. At all times herein mentioned the defendant, Correction Officer Griswold (Griswold), is and was a custody staff member of the D.O.C. providing medical care services to inmates at MacDougall, as a C.O.; and is sued herein in an individual and official capacity.

10. At all times herein mentioned the defendant, Nurse Bonnie, is and was a medical staff member of the D.O.C. providing medical care services to inmates at MacDougall, as a nurse; and is sued herein in an individual and official capacity.

Count One:

1-11. Paragraphs numbering 1-10 of the foregoing are incorporated here by reference as if set forth at length and made a part hereof this the First Count.

12. On or about September 8, 2020, Dixon was playing basketball in the recreation yard designated for his housing unit.

13. In the act of turning, Dixon experienced a sharp, severe and debilitating pain in and about the achilles tendon, emanating from the posterior of his right ankle and spreading up the back of his leg towards the back of the knee.

14. The pain was so severe as to prevent Dixon from stepping onto his right foot and even the slightest of movements of the ankle and foot would cause Dixon sharp, shooting pain that would average 6 to 9 out of a 10 point gradient pain scale.

15. Dixon immediately reported his injury to custody staff; that he reasonably believed he had caused serious injury to his achilles tendon.

16. Custody staff contacted the appropriate medical staff, who responded with a wheelchair to take Dixon to the facility medical department for examination.

17. Upon arrival at medical, Dixon was examined by Gwen, and explained how his injury occurred and the severity of his debilitating pain which prevented his ability to freely ambulate.

18. Gwen refused to provide Dixon with any form of pain management saying to Dixon that she was "on overtime" and "in a rush" because she was "ready to leave" for the day.

19. Gwen had the ability to issue Dixon a "contingency" bottle of ibuprofen to alleviate some of the severity of plaintiff's suffering, and alternatively, to contact the "on call" doctor and receive a verbal order for proper pain management regimen, pursuant to the D.O.C. protocols, for nursing staff.

20. Gwen had a duty to abide by and utilize the proper nursing protocols to alleviate and care for plaintiff's physical and mental pain and suffering.

21. Gwen maliciously failed or refused to implement and utilize the proper nursing protocols to manage Dixon's pain and suffering for her own personal convenience, in disregard and deliberate indifference to Dixon's suffering.

22. On or about September 9, 2020, at approximately nine-thirty a.m. (9:30 a.m.), Dixon was called to medical and seen by Lupis.

23. Lupis conducted a physical examination of Dixon's injury as plaintiff described the extreme and debilitating pain in his ankle and achillies, radiating up towards the back of his knee and preventing his movement of the ankle and ability to ambulate.

24. Dixon asked Lupis to provide him some Motrin or other form of pain management for the unbearable level of pain averaging between 6 to 9 out of a 10 point gradient, pain scale.

25. Lupis failed or refused to provide Dixon any form of pain management regimen

instead ordering x-rays, plaintiff believes and thereby alleges, because Lupis believed Dixon to be malingering and lying about his pain; and chose to ignore Dixon's subjective descriptions of his own physical condition.

26. Lupis had the ability and duty to treat both Dixon's physical injury, by performing diagnostic imaging testing; as well as treating Dixon's subjective pain and suffering resulting from that injury.

27. Lupis failed or refused to treat Dixon's physical pain and disregarded plaintiff's pleas for relief from his suffering, remaining deliberately indifferent thereto, and failed in his duty.

28. On or about September 2, 2020, at approximately one-fifty-five p.m. (1:55 p.m.), Dixon was called to medical where x-rays were taken of his foot and ankle by an x-ray technician.

29. However, neither Lupis, or any other defendant, ever called plaintiff down to medical to discuss the x-rays, in disregard and indifference to plaintiff's stress, anxiety and concern for his own medical condition, and his physical pain and suffering.

30. On or about September 14, 2020, at approximately nine-fifteen a.m. (9:15 a.m.), Dixon spoke with Nurse Bonnie in his housing unit's medical treatment area.

31. Dixon fully explained to Nurse Bonnie the severity of his pain being on a constant 6-9, and as having sharp, shooting pains with even minor movements of his foot or ankle; all of which were beyond his threshhold of pain tolerance.

32. Plaintiff pleaded with Nurse Bonnie to provide him some form of pain management regimen, even if it were only Motrin, to start.

33. Defendant Nurse Bonnie had the duty, and ability pursuant to standard nursing protocols; to give Dixon a contingency of Motrin, Ibuprofen or aspirin to alleviate the severity of Dixon's pain; and had the ability and duty to request a doctor's

order for a pain management regimen prescription.

34. Defendant Nurse Bonnie failed or refused to provide Dixon any options, saying instead that plaintiff could "ask an officer to be sent to medical to be given ice."

35. Although ice may have made a very slight difference in swelling, it did nothing to alleviate Dixon's pain, discomfort or severe emotional distress.

36. Instead, plaintiff was made to suffer needlessly, and worse, when a facility lock-down occurred, from September 14, 2020, up to and including September 19, 2020, the plaintiff was not even given ice.

37. On September 16, 2020, while plaintiff was on facility lock-down, Dixon wrote an Inmate Request Form directed to Lupis, stating that he "wasn't given any type of pain relief medication & ... the results of [his] x-rays either," and "that the issue is a possible tear to [his] achillies tendon, wouldn't the proactive thing be to schedule [him] for a[n] M.R.I.?".

38. Lupis callously responded on September 22, 2020, that "you are scheduled for an M.R.I. of the ankle. Depending on the results, we will schedule an orthopedic visit also.", but, never addressed plaintiff's need for pain management therapy, nor, provided any for Dixon.

39. On or about September 22, 2020, at approximately nine-thirty a.m. (9:30 a.m.), Dixon spoke with Lisa, during an examination, in the Q-Pod housing unit's medical treatment room; and emphatically described his constant, extreme and sharp shooting pain, and that he was not being provided any pain management.

40. Dixon also expressed his concern and extreme emotional distress at not having been called back to be seen by Lupis, since September 9, 2020; nor, been presented for an M.R.I.; stressing the importance of prompt treatment for his injury.

41. During the examination, Lisa assured Dixon that she would call him to medical later that day for further examination, assessment and pain management therapy medications.

42. Lisa never did call Dixon down to medical and instead, knowingly left him to continue suffering the extreme pain and mental suffering.

43. Lisa had the ability and duty to issue Dixon a contingency supply of Motrin, and to contact Lupis, or the on-call provider; to request an immediate prescriptive order for pain management regimen, within the proper nursing protocols; and failed and refused to honor this duty to Dixon.

44. On or about September 23, 2020, Dixon was called to medical, by Good, to sign a "Patient Prioritization and Transportation Specialty Appointment Notification" (the notice), informing Dixon that he would be going to UConn for an M.R.I.

45. Good, had the ability and duty to provide Dixon with a contingency supply of Motrin, ibuprofen and/or contacting a prescriber or on-call physician and obtaining a prescriptive order for pain management regimen, and failed and refused to honor this duty, to the detriment of Dixon knowing he would continue to suffer needlessly.

46. On or about September 25, 2020, the plaintiff was taken to UConn, allegedly for the M.R.I., as informed by Lupis and Good.

47. Dixon was seen by Wellington, an orthopedic surgeon at UConn; and explained how the injury occurred, the intensity of the pain he experienced, including it's constancy and sharp-shooting characteristics since the September 5, 2020, injury.

48. Wellington then examined Dixon's right foot, ankle and achillies, while informing Dixon he was there for an M.R.I.

49. Wellington then issued Dixon a medical boot to protect his foot and ankle, then told Dixon he would be called for his M.R.I., shortly.

50. Instead, Wellington issued medical orders that Dixon be returned back to MacDougall, without the M.R.I.; and that Dixon could exchange his crutches for a cane if he preferred, without regard for the failure to be able to fully realize the extent of the plaintiff's injuries, absent the M.R.I.

51. On or about September 25, 2020, Good called Dixon to medical and informed him that they were scheduling another transport for an M.R.I., but, once again failed and refused to honor her obligations to provide Dixon any form of pain management regimen.

52. On or about September 28, 2020, Dixon wrote an Inmate Request Form informing Good, inter alia, that he "wasn't & haven't been given anything for the Constant Pain that [he's] been in non-stop since the day of the injury, no Motrin or other..."

53. Rather than receiving the desperately needed pain relief, Dixon received a maliciously dismissive response, dated September 29, 2020; telling him to "Please sign up for prompt care", when the care for which he has been repeatedly seen was anything but "prompt".

54. On or about October 1, 2020, plaintiff filed a Health Services Review, describing the deficiencies in his care as alleged herein above.

55. On or about October 5, 2020, plaintiff received in the inter-departmental mail, a new Patient Prioritization and Transportation Specialty Appointment notification form (the notice), informing him of a second M.R.I. being scheduled, and the form needed to be signed and returned to Good.

56. On or about October 6, 2020, between 9:00 a.m. and 11:00 a.m., the plaintiff was allowed to take the form to medical by the unit's officer, where he was met by Griswold.

57. Dixon informed Griswold that he had an important form for Good, and he wanted to make certain Good received it in a timely manner so he could finally see a specialist for his injury.

58. After Griswold called Good's office, Dixon removed the signed notice 2 from its envelope, showed it to Griswold and explained the importance of the timely receipt of the notice 2, by Good; because of the risks of degradation of his condition.

59. Griswold assured Dixon that she would "make sure it gets to where it needs to go," took the envelope, and left the medical reception lobby as Dixon returned to his housing unit.

60. On or about October 8, 2020, Dixon received a duplicate of the notice 2, delivered to him through the interdepartmental mail system from Good; as had been handed to Griswold, signed by Dixon, on October 6, 2020.

61. Dixon believes and thereby alleges that Griswold mishandled the notice 2 with a malicious and callous disregard for the delay to plaintiff's care inherent in the delayed receipt of the notice 2, by Good; occassioned by Griswold's mishandling of the document.

62. Dixon's reasonable belief led him to file an Inmate Request Form, dated October 8, 2020; requesting that MacDougall's Captain Limmer, preserve the video footage of his surrender of the notice 2 to Griswold.

63. On or about October 15, 2020, Dixon was brought to UConn for his M.R.I., and informed that the results would not be available until after a few days, and that they would be sent via computer.

64. On or about October 23, 2020, Dixon wrote an Inmate Request Form to MacDougall's Captain Angelakopoulos, asking that the video footage of his examination, by Lise; on September 22, 2020, from the Q-Pod housing unit medical treatment room be preserved.

65. On or about October 30, 2020, at approximately 8:30 a.m, the plaintiff was called to medical, where he was seen by Lupis and informed that his achillies tendon was in fact torn.

66. Plaintiff angrily informed Lupis that his injury should have been handled in a more timely manner, and that he was extremely distressed believing that it would not properly

or readily heal given that so much time was allowed to lapse, and would therefore further delay any opportunities he may have at rehabilitation.

67. Dixon then asked Lupis if he had anything to say about his lack of adequate care and Lupis sarcastically and maliciously responded that Dixon should have his mother stop calling the facility medical department, in callous disregard for Dixon's continued suffering, and extreme emotional distress.

68. Plaintiff believes and thereby alleges that Lupis maliciously delayed Dixon's receipt of timely medical care, to punish plaintiff for involving his mother in attempting to correct the extreme delay in receiving adequate medical treatment.

69. On or about October 30, 2020, Dixon received a response to his Health Services Review, dated October 1, 2020, from Walker telling Dixon "You had an MRI on 10/15/2020" and noting a disposition of "No Further Action", which constitutes as an exhaustion of administrative remedies pursuant to the D.O.C. Administrative Directive (A.D.) 8.9, entitled "Administrative Remedy for Health Services".

70. On or about October 31, 2020, Dixon filed a new Health Services Review, in recognition of Walker's failure and refusal to address Dixon's complaints that he was forced to endure months of endless and extreme, constant pain and suffering.

71. Plaintiff believes and thereby alleges that on November 4, 2020, his mother contacted Barone, by telephone, and explained to Barone the plaintiff's distress at having still not received corrective surgery or any form of pain management regimen.

72. On or about November 6, 2020, plaintiff wrote an Inmate Request Form to Captain Limmer regarding preservation of video footage for September 14 and 22, 2020; whereas Limmer is designated as the person in charge of video preservations.

73. On or about November 9, 2020, plaintiff wrote an Inmate Request Form to defendant Barone, explaining in great detail the constant pain he has endured, and that the medical staff had done nothing to alleviate Dixon's extreme pain and mental suffering.

74. On or about November 10, 2020, plaintiff received a written response to his video preservation request assigning evidence id # Mac-vp-20-1016 and Mac-vp-20-1017.

75. On or about November 13, 2020, the plaintiff was brought to UConn Health Center for a surgical consultation with an individual known as Ann.

76. The plaintiff openly discussed with Ann the extent of his injury, incapacity and extreme pain, suffering and emotional stress knowing that his injury was getting worse as time passed, and defendants failure and refusal to provide pain management regimen and timely and adequate medical care.

77. Plaintiff repeatedly stressed his desire to have his torn tendon repaired surgically, at the earliest possible date.

78. The defendants knew or should have known that their actions, or lack thereof, would cause plaintiff extreme harm, injury, pain, suffering and extreme emotional distress.

79. Plaintiff did suffer extreme harm, injury, physical pain and suffering and extreme emotional distress, as discussed herein above and below; including, but not limited to:

a) Dixon suffered extreme and constant pain emanating from his ankle and spreading upwards towards the back of the knee, that varied in and at a fluctuating pain scale gradient of 6 to 9 out of 10, that was unbearable and left unabated or mitigated by any efforts, or lack thereof, of the defendants, and;

b) Dixon suffered extreme and sudden, sharp shooting pains emanating from his ankle and radiating out to his toes and up the back of his leg towards the knee, that was well in excess of the level 6 to 9 gradient pain level that was constant, every time that plaintiff moved his foot, ankle or leg, and;

c) Dixon suffered extreme emotional distress knowing that defendants were allowing him to suffer needlessly and knowingly, and;

d) Dixon suffered extreme and lasting emotional distress knowing that defendants were knowingly and maliciously refusing to provide him timely and adequate medical care and that such delays in the provision of care could, and would cause greater and irreparable loss and injury to the mobility of his leg, and;

e) Dixon suffered extreme, lasting and ongoing emotional distress being unreasonably incapacitated by pain, due to defendants' failures and refusals to provide any pain management regimen; and preventing Dixon from performing a large variety of his daily tasks and enjoyment of life, and;

f) Dixon suffered extreme, lasting and ongoing emotional distress, believing himself vulnerable, at risk and unable to defend himself in a hostile and violent prison environment, causing Dixon depression, lethargy and loss of enjoyment of life and his daily functions and activities.

80. Therefore, plaintiff prays this court grant the following relief:

a) Compensatory damages of $250,000.00 jointly and severally from defendants, and;

b) Punitive damages of $250,000.00 jointly and severally from defendants, and;

c) Injunctive relief commanding defendants provide plaintiff with adequate, meaningful and timely post-operative care and rehabilitative therapy, and;

d) Costs and attorney fees, and;

e) Such other and further relief this court deems just and equitable.

## Legal Claims

81. Defendants conduct in failing and refusing to provide plaintiff with timely, meaningful and adequate diagnostic and surgical care and treatment, and failure to provide any pain management regimen whatsoever, causing Dixon to needlessly suffer physical pain and extreme emotional distress constitutes as deliberate indifference to plaintiff's serious medical needs, in violation of the Eighth Amendment to the United States Constitution and the negligent and intentional infliction of emotional distress under pendente state jurisdiction.

82. Defendants' conduct in further delaying plaintiff's surgical correction for his injury, as punishment for Pixon's mom reporting the defendants failure to provide adequate care, and writing grievances and Health Service Reviews, in preparation of litigation; constitutes as a denial of access to the courts, right to redress of grievances and right to freedom of speech, in violation of the First and Fourteenth Amendments to the United States Constitution and Article First, §§ 4, 5, 10 and 14 of the constitution of the State of Connecticut.

Count Two:

1-83. Paragraphs numbering 1-82 of the foregoing are incorporated here by reference as if set forth at length and made a part hereof this the Second Count.

84. On or about October 15, 2020, an M.R.I. identified a high-grade, near complete, full-thickness tear of the mid-substance of the achilles tendon measuring 2.4 cm in length, approximately 5 cm proximal to the calcaneal insertion in the background of severe tendinosis, as well as a grade I sprain of the deep fibers of the deltoid ligamentous complex.

85. Pixon remained uninformed of this diagnostic identification of the injury as defendants Iam, Lupis, Gwen, Lisa, Good, Barone and Walker actively delayed his care and denied any and all pain management regimen.

86. On or about November 13, 2020, Pixon met with Dr. Anna Jorgensen, who, as an orthopedic surgeon, recommended that Pixon be treated with a continued use of the walking boot, "Tylenol and Motrin scheduled around-the-clock to allow for initiation of... eccentric strengthening protocol," as well as "soaking the foot in Epsom salts to reduce some of the hypersensitivity, pending surgery."

87. Despite these recommendations by the specialist, Pixon was never started on any pre-op pain management regimen, or soaking the foot in Epsom salts; by the defendants who continued to deny and unreasonably delay care maliciously.

88. Ultimately, Dixon's surgical correction was delayed until December 3, 2020, at which time plaintiff's fears were confirmed by UConn surgical staff, who provided Dixon with instruction on a chronic rupture of the achilles tendon, consistent with Dixon's diagnosis and surgical repair.

89. Dixon learned that "[w]hen the Achilles tendon rupture is not diagnosed early on, the ends of the tendon begin to separate (retract). Walking and pushing off with the foot become increasingly difficult. There are however other muscles in the leg which try to compensate for the loss of the Achilles ... but these are never sufficient to maintain the power and strength of the leg."

90. "Due to the extra workload on the other muscles of the leg which try to compensate for the weakness, the toes begin to curl and may become permanently deformed. Treatment of a chronic rupture of the Achilles tendon... surgery should be performed."

91. "The type of surgery performed depends on the size of the gap between the tendon ends and the extent of separation that is present... If the separation is minimal, then the tendon ends can be stitched together...."

92. However, because Dixon's "separation [was] more significant, then other procedures need[ed] to be performed including ... a tendon transfer using one of [his] own tendons..."

93. "The tendon transfer uses the second strongest muscle in the leg after the gastrocnemius, which is the muscle to the big toe (the flexor hallucis longus)."

94. Following the transfer of Dixon's tendon, although "strength of the leg after the reconstruction is good, but unfortunately, never normal," (emphasis added), that amounts to permanent and irreparable injury.

95. Plaintiff believes and thereby alleges that defendants delay in providing treatment of the injury allowed the ends of the tendons to separate and retract to a

greater gap, than would have otherwise occurred; thereby necessitating a full tendon transfer; that created twice the number of surgical sites, weakening the plaintiff's big toe, by loss of the tendon; and weakening the Achilles tendon from the transfer of foreign material, i.e., the toe tendon; into the Achilles and causing permanent injury to the plaintiff.

96. Defendants knew or should have known that their actions, or lack there of; could cause Dixon severe physical injury and extreme emotional distress.

97. Dixon was harmed and injured as a direct and proximate cause of the defendants actions, or lack there of; as herein described above.

98. Therefore, plaintiff prays this court grant the following relief:
   a) compensatory damages of $250,000.00, jointly and severally from defendants, and;
   b) punitive damages of $250,000.00, jointly and severally from defendants, and;
   c) injunctive relief, commanding defendants provide Dixon with adequate, meaningful and timely post-operative care and rehabilitative therapy, and;
   d) costs and attorney fees, and;
   e) such other relief as this court deems just and equitable.

## Legal claims

99. The defendants conduct in delaying plaintiff medical care causing greater tendon retraction necessitating a full tendon transfer, constitutes as deliberate indifference to the serious medical needs of the plaintiff, in violation of the Eighth Amendment to the United States Constitution.

## Statement of Past Actions

100. The plaintiff hereby states that he has not brought any prior actions premised on the same set of facts set forth herein-above.

### Statement of Previously Dismissed Actions or Appeals

101. Plaintiff hereby states that he has not had any prior actions or appeals that were dismissed as frivolous, malicious or for failure to state a claim such as to subject him to the three-strikes-rule of 28 U.S.C. § 1915(g).

### Jurisdictional Statement

102. This action is brought to remedy the deprivation of constitutional rights under 42 U.S.C. § 1983. This court has jurisdiction pursuant to 42 U.S.C. §§ 12131 & 12132, 29 U.S.C. §§ 706(7)(B) & 794; 28 U.S.C. § 1331, 1331(a), & 1343(a)(3). Injunctive jurisdiction pursuant to 28 U.S.C. §§ 2283 & 2284 and pendente jurisdiction pursuant to 28 U.S.C. § 1367, § 1391(b)(2) and C.G.S. § 52-1.

### Declaration Under Penalty of Perjury

103. I hereby declare under penalty of perjury that I am the plaintiff in the above complaint, that I have read the foregoing and the contents thereof are true and correct to the best of my knowledge and belief, and to those alleged upon information and belief, I believe them to be true and correct. I understand that if I lie in this complaint I may be prosecuted for perjury and punished with as much as five (5) years in prison and/or fined up to $250,000.00.

Executed this 1st day of February 2021      by _Robert Dixon_
RD
Robert Dixon #305241
1153 East St. South
Suffield, CT. 06080

### Certification of Service

The undersigned hereby certifies the foregoing was submitted 2/2/21 for e-filing prior to issuance of the Initial Review Order and service upon defendants and therefore a copy has NOT been served upon any of the non-party.

A courtesy copy of the foregoing has been served upon:

Office of the Assistants of the Attorney General, 110 Sherman St., Hartford, CT. 06105

by _Robert Dixon_
Plaintiff