## UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ROBERT DIXON, | : | Case No. 3:20cv1754 (VLB) |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| DR. FRANCESCO LUPIS, ET AL., | : | September 24, 2021 |
| Defendants. | : | |

## INITIAL REVIEW ORDER – AMENDED COMPLAINT

The plaintiff, Robert Dixon ("Dixon"), is currently incarcerated at MacDougall-Walker Correctional Institution ("MacDougall-Walker") in Suffield, Connecticut. He has filed an amended complaint under 42 U.S.C. § 1983, Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131, 12132, and the Rehabilitation Act of 1973 ("RA"), 29 U.S.C. § 794(a) against eight medical providers and one custody official employed by the State of Connecticut Department of Correction and one medical provider employed by the University of Connecticut Health Center ("UCONN"). He also seeks the appointment of *pro bono* counsel. For the reasons set forth below, the Court will dismiss the complaint in part and deny the motion for appointment of counsel.

I.   <u>Amended Complaint – ECF No. 9</u>

Dixon names Drs. Francesco Lupis and Ian Wellington, Nurses Gwen Hitte, Lisa Candelario and Bonnie, Medical Staff Member Holly Good, Custody Staff Member Kristine Barone ("Staff Member Barone"), Health Services Review Coordinator/Nurse Rose Walker ("HSR Coordinator/Nurse Walker") and Correction Officer Griswold as defendants. He alleges that defendants failed to

provide him with or to facilitate the provision of timely medical treatment for an injury that he suffered to his right achilles tendon in early September 2020.

A.   <u>Standard of Review</u>

Pursuant to 28 U.S.C. § 1915A(b), the Court must review prisoner civil complaints against governmental actors and "dismiss . . . any portion of [a] complaint [that] is frivolous, malicious, or fails to state a claim upon which relief may be granted," or that "seeks monetary relief from a defendant who is immune from such relief."  *Id.*  This standard of review "appl[ies] to all civil complaints brought by prisoners against governmental officials or entities regardless of whether the prisoner has paid [a] filing fee."  *Shakur v. Selsky*, 391 F.3d 106, 112 (2d Cir. 2004) (internal quotation marks and citation omitted).

Rule 8 of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Although detailed allegations are not required, a complaint must include enough facts "to state a claim to relief that is plausible on its face.  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citations omitted).  A complaint that includes only "'labels and conclusions,' 'a formulaic recitation of the elements of a cause of action' or 'naked assertion[s]' devoid of 'further factual enhancement,'" does not meet the facial plausibility standard.  *Id.* (quoting *Bell*

2

*Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007)).

It is well-established that "*[p]ro se* complaints 'must be construed liberally and interpreted to raise the strongest arguments that they suggest.'" *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)); *see also Tracy v. Freshwater*, 623 F.3d 90, 101–02 (2d Cir. 2010) (discussing special rules of solicitude for *pro se* litigants). However, notwithstanding this liberal interpretation, a *pro se* complaint will not survive dismissal unless the factual allegations meet the plausibility standard. *See, e.g., Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 387 (2d Cir. 2015).

B.   Facts

On September 8, 2020, during a basketball game in the recreation yard at MacDougall-Walker, Dixon experienced sharp pain in his right ankle that traveled up the back of his right calf to his knee. Am. Compl., ECF No. 9, at 3 ¶ 12. The slightest movement of Dixon's right ankle and foot caused him to experience pain at a level of 6 out of 10. *Id.* ¶ 14. After becoming aware of Dixon's injury, a correctional officer contacted the medical department. *Id.* ¶¶ 15-16. A medical staff member transported Dixon to the medical department in a wheelchair. *Id.* ¶ 16. Nurse Hitte examined Dixon's right ankle and foot, provided him with crutches and a bag of ice and sent him back to his housing unit. *Id.* at 4 ¶ 17; Compl., ECF No. 1, at 22 ¶ 6. Nurse Hitte did not provide medication to Dixon to alleviate the pain caused by his injury. Am. Compl., ECF No. 9, at 4 ¶ 18.

3

The next morning, Dr. Lupis examined Dixon's ankle.  *Id.* ¶¶ 22-23.  Dixon explained that the injury to his ankle caused him severe pain in his right calf which interfered with his ability to walk.  *Id.* ¶ 23.  He described the level of pain as 6 to 9 out of 10 and asked Dr. Lupis to provide or prescribe him with medication to alleviate the pain.  *Id.* ¶ 24.  Dr. Lupis entered an order that Dixon undergo x-rays of his right foot and ankle but did not prescribe medication or provide any other treatment to alleviate the pain caused by Dixon's injury.  *Id.* at 4-5 ¶ 25.  That afternoon, Dixon underwent x-rays of his right foot and ankle.  *Id.* at 5 ¶ 28.  No one informed Dixon of the results of the x-rays.  *Id.* ¶ 29.

On September 14, 2020, Dixon spoke to Nurse Bonnie.  *Id.* ¶ 30.  He explained that his ankle was in constant pain, at a level of 6 to 9 out of 10, and pleaded with her to administer pain medication.  *Id.* ¶¶ 31-32.  Nurse Bonnie recommended that Dixon ask a correctional officer for permission to be sent to the medical department to get some ice for his ankle.  *Id.* at 6 ¶ 34.  Dixon was able to get some ice which did reduce some of the swelling in his ankle but did not alleviate the pain.  *Id.* ¶ 35.  Dixon was unable to get ice for the next several days because the prison was on lockdown.  *Id.* ¶ 36.

On September 16, 2020, Dixon sent a request to Dr. Lupis seeking pain relief for his injury and to discuss the results of his ankle and foot x-rays.  *Id.* ¶ 37.  In a response dated September 22, 2020, Dr. Lupis informed Dixon that he was scheduled for an MRI of his right ankle and that any referral to an orthopedist would depend on the results of the MRI.  *Id.*

4

During the morning of September 22, 2020, Nurse Candelario examined Dixon. *Id.* ¶ 39. Dixon explained that he was experiencing constant, shooting pain in his ankle and that he had not been prescribed medication or any other treatment to alleviate the pain. *Id.* Nurse Candelario assured Dixon that she would call him to the medical department later that day to examine and assess his injury and prescribe medication or other treatment to alleviate the pain caused by the injury. *Id.* at 7 ¶ 41. Nurse Candelario never called Dixon to the medical department. *Id.* ¶ 42.

The following day, Medical Staff Member Good summoned Dixon to the medical department. *Id.* ¶ 44. She informed Dixon that the request to approve his referral to the University of Connecticut Health Center ("UCONN") for an MRI had been granted and asked him to sign a form authorizing his transport to UCONN for the MRI. *Id.* Medical Staff Member Good did not provide medication to Dixon to alleviate the pain caused by his ankle injury or call a physician to request a prescription for pain medication. *Id.* ¶ 45.

On September 25, 2020, prison officials transported Dixon to UCONN. *Id.* ¶ 46. At UCONN, Dr. Wellington, who was an orthopedic surgeon, examined Dixon and listened to his description of how the injury occurred and the location and degree of the pain it caused him. *Id.* ¶¶ 47-48. Dr. Wellington provided Dixon with a medical boot to protect his right foot and ankle, entered an order that Dixon could use a cane instead of crutches to ambulate, and informed Dixon that he would have to remain in the waiting room until a hospital staff member escorted

him to undergo an MRI of his ankle and foot.  *Id.* at 7-8 ¶¶ 49-50.  After sitting in the waiting room for two hours, prison officials transported Dixon back to MacDougall-Walker.  *Id.* at 8 ¶ 50; Compl., ECF No. 1, at 27-28 ¶¶ 51-52.  Dixon did not undergo an MRI that day.  Am. Compl., ECF No. 9, at 8 ¶ 50.

On September 28, 2020, Medical Staff Member Good summoned Dixon to the medical department to inform him that she would be scheduling him to be transported back to UCONN to undergo an MRI of his ankle and foot.  *Id.* ¶ 52. Dixon remarked that the MRI was supposed to have been performed during his visit to UCONN on September 25, 2020 and suggested that Medical Staff Member Good had been negligent in failing to ensure that the MRI occurred on that date. Compl., ECF No. 1, at 28 ¶¶ 58-61.  Medical Staff Member Good did not respond to these remarks and suggested that Dixon submit a written request.  *Id.* at 29 ¶¶ 62-63.  Medical Staff Member Good did not provide Dixon with medication to alleviate the pain caused by his ankle injury.  Am. Compl., ECF No. 9, at 8 ¶ 51.

Later that day, Dixon sent an inmate request to Good explaining that his ankle was still painful and that he had not been prescribed medication or other treatment to alleviate the pain.  *Id.* ¶ 52.  In response to this request, a medical staff member recommended that Dixon sign up for prompt care.  *Id.* ¶ 53.

On October 1, 2020, Dixon filed a request for Health Services Review regarding the failure of medical staff members to provide him with timely diagnostic testing and adequate treatment for his painful ankle injury.  *Id.* ¶ 54. On October 5, 2020, Dixon received, via interdepartmental mail, an authorization

form indicating that the Department of Correction would be transporting him to UCONN for an MRI.  *Id*. ¶ 55.  On October 6, 2020, Dixon signed the form and brought it to the medical department to give to Medical Staff Member Good.  *Id*. ¶ 56.  Upon his arrival at the medical department, Dixon explained to Correction Officer Griswold that it was important that the authorization form be delivered to Staff Member Good as soon as possible because it related to the treatment and diagnosis of his injury.  *Id*. ¶ 57.  After attempting to unsuccessfully reach Good by phone, Officer Griswold took the signed authorization form from Dixon and stated that she would make sure that it reached Staff Member Good.  *Id*. at 9 ¶¶ 58-59.

On October 8, 2020, Dixon received, via interdepartmental mail, a second authorization form indicating that the Department of Correction would be transporting him to UCONN for an MRI.  *Id*. ¶ 60.  On October 15, 2020, prison officials transported Dixon to UCONN where he underwent an MRI of his right foot and ankle.  *Id*. ¶ 63.  The MRI technician informed Dixon that the results would not be available for several days.  *Id*.  On October 23, 2020, Dr. Lupis informed Dixon that the MRI revealed that his right achilles tendon was torn.  *Id*. ¶ 65.  Dixon expressed his anger and distress regarding the delay in receiving this diagnosis and his concern about the success of any attempt to surgically repair the torn tendon.  *Id*. at 9-10 ¶ 66.  When he asked Dr. Lupis whether he had any comment about the delay in diagnosing his injury, Dr. Lupis remarked that Dixon should suggest that his mother stop calling the medical department.  *Id*. at 10 ¶ 67.

On October 30, 2020, HSR Coordinator/Nurse Walker responded to Dixon's October 1, 2020 request for Health Services Review. *Id*. ¶ 69.  She noted that Dixon had undergone an MRI of his right ankle and foot on October 15, 2020 and marked the request – "No Further Action." *Id*.  On October 31, 2020, Dixon filed a request for Health Services Review regarding the failure of HSR Coordinator/Nurse Walker to address his request for treatment of his painful injury to his achilles tendon. *Id*. ¶ 70.

Dixon believes that his mother called Staff Member Barone on November 4, 2020 regarding the fact that he had not received corrective surgery to repair his torn achilles tendon or medication or other treatment to alleviate the pain caused by the torn tendon. *Id*. ¶ 71.  On November 9, 2020, Dixon wrote to Barone about the failure of medical staff members to provide him with medication or other treatment to alleviate the pain caused by his torn achilles tendon. *Id*. ¶ 73.

On November 13, 2020, prison officials transported Dixon to UCONN for a surgical consultation with Orthopedist Anna Jorgensen. *Id*. at 11 ¶¶ 75-77, 86. Dr. Jorgensen recommended that Dixon undergo surgery to repair his torn achilles tendon and Dixon agreed to the procedure. *Id*. at 11, 13 ¶ 77, 86.  In preparation for the surgical procedure, Dr. Jorgensen instructed Dixon to continue wearing the medical walking boot and recommended that he take Tylenol and Motrin around the clock and soak his foot in Epsom salts. *Id*. at 13 ¶ 86.  Medical providers at MacDougall-Walker did not implement Dr. Jorgensen's recommendations regarding a pre-operative plan to manage the pain and swelling

8

caused by the tear to Dixon's achilles tendon. *Id.* ¶ 87.

On December 3, 2020, Dixon underwent a surgical procedure to repair his achilles tendon. *Id.* at 14 ¶ 88. The surgeon who performed the procedure informed Dixon that the separation between the two ends of the torn tendon was too wide to simply stitch the two ends together and that he or she had repaired his torn achilles tendon using the tendon transfer method. *Id.* ¶¶ 88-93. The surgeon used a piece of Dixon's flexor hallucis longus tendon in his great toe to complete the repair. *Id.*

### C.   Discussion

Dixon claims that the defendants were deliberately indifferent to his medical needs in violation of the Eighth Amendment and retaliated against him and denied him access to courts in violation of the First and Fourteenth Amendments. Dixon also purports to invoke the Court's jurisdiction under the ADA and RA and requests that the Court exercise supplemental jurisdiction over claims that the defendants violated his rights under Article First §§ 4, 5, 10 and 14 of the Connecticut Constitution and engaged in conduct that constituted negligent infliction of emotional distress ("NIED") and intentional infliction of emotional distress ("IIED").

#### 1.   ADA and RA

Other than the jurisdictional statement on the last page of the complaint, Dixon does not otherwise refer to the ADA or the RA or allege that the defendants violated his rights under either Act. *Id.* at 12-13, 15. Under Title II of the ADA, "no

qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  Under Section 504 of the RA, "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . ." 29 U.S.C. § 794(a).  Thus, the RA differs from the ADA in that it applies to entities that "receive federal funding." *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003).

The Second Circuit analyzes claims asserted under Title II of the ADA and Section 504 of the RA under the same standard. *See Wright v. New York State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016) (citation omitted).  In order to state a claim under either the RA or the ADA, a plaintiff must allege that 1) he is a qualified individual with a disability; 2) the defendant is an entity subject to the acts; and 3) he was denied the opportunity to participate in or benefit from [the defendant's] services, programs, or activities or [the defendant] otherwise discriminated against him by reason of his disability." *Wright*, 831 F.3d at 2.

Dixon alleges that he suffered a painful tear to his achilles tendon that interfered with his ability to walk.  These allegations satisfy the first element of an ADA and an RA claim.  Furthermore, the Department of Correction is an entity that is subject to both Acts. *See, e.g., Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206,

209 (1998) (ADA "includes State prisoners and prisons within its coverage);
*Wright*, 831 F.3d at 72 (ADA and RA "apply to state prisons and their prisoners.")
(citation omitted).  Thus, the second element of both Acts has been met.

Dixon has failed to assert facts to meet the third element of either an ADA
or an RA claim.  Dixon fails to identify any program, benefit or activity that he was
denied the ability to participate in because of his disability.  Nor are there facts to
suggest that the defendants treated Dixon adversely because of his disabling
injury.  Rather, his claim is that the defendants failed to provide him with
adequate treatment to alleviate the pain caused by his disabling injury and failed
to provide him with timely treatment to repair the injury to his achilles tendon.
Thus, Dixon's allegations address the inadequacy of treatment provided by the
defendants for his disabling condition and not discriminatory conduct motivated
by his disabling condition.  *See, e.g.*, *Schnauder v. Gibens*, 679 F. App'x 8, 11 (2d
Cir. 2017) (summary order) (affirming the dismissal of a plaintiff's ADA/RA claim
because inmate's disability – a breathing difficulty caused by a broken nose -
"was not the reason he was unable to access medical services; rather, it was the
reason he sought such services," so "he ha[d] not pleaded facts showing that
denial of treatment was attributable to bias based on disability" (citation
omitted)); *Sherman v. Cook*, No. 3:20-CV-1485 (SRU), 2021 WL 311283, at *5 (D.
Conn. Jan. 29, 2021) (dismissing  claims asserted under ADA and RA related to
treatment of inmate's shoulder conditions because claims were "based on a lack
of access to adequate medical care, not denial of access to programs or services

available to non-disabled persons, or discrimination on the basis of disability.");
*Reese v. Breton*, No. 3:18-CV-1465 (VAB), 2020 WL 998732, at *5 (D. Conn. Mar. 2, 2020) ("Neither the ADA nor the RA, however, applies to claims regarding the adequacy or substance of services provided by correctional departments or provides a remedy for medical malpractice.") (collecting cases).

Dixon has failed to assert facts to state a plausible claim for relief under the ADA or the RA.  The ADA and RA claims asserted against the defendants are dismissed.  *See* 28 U.S.C. § 1915A(b)(1).

### 2. Section 1983 - Eighth Amendment Claim

In *Estelle v Gamble*, 429 U.S. 97 (1976), the Supreme Court held that the Eighth Amendment prohibits "deliberate indifference to an inmate's serious medical needs."  *Id.* at 104.  Deliberate indifference may not only be "manifested by prison doctors in their response to the prisoner's needs" but also "by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed."  *Id.* at 104-05.

To state an Eighth Amendment deliberate indifference claim, an inmate must meet two elements.  The first element requires the inmate to allege facts that demonstrate that his medical need or condition is objectively serious.  *See Hill v. Curcione*, 657 F.3d 116, 122–23 (2d Cir. 2011) (a serious medical need contemplates "a condition of urgency" such as "one that may produce death, degeneration, or extreme pain") (internal quotation marks and citation omitted).  In determining whether a condition is serious, the Court considers whether "a

12

reasonable doctor or patient would find [it] important and worthy of comment," whether the condition "significantly affects an individual's daily activities," and whether it causes "chronic and substantial pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (internal quotation marks and citations omitted).

To meet the second element of an Eighth Amendment deliberate indifference claim involving a medical condition, an inmate must allege that the official acted with the requisite *mens rea,* that is, that the prison official or medical provider was actually aware that his actions or inactions would create a substantial risk of serious harm to the inmate. *See Hill*, 657 F.3d at 122 (citation omitted). Mere negligent conduct, however, does not constitute deliberate indifference. *Id.* at 123 ("'a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.'") (quoting *Estelle*, 429 U.S. at 106).

### a.   Objective Component

Dixon alleges that he suffered a painful tear to his right achilles tendon that made it difficult for him to put weight on his right foot and to walk. The pain in his achilles tendon and ankle continued unabated until he underwent surgery in December 2020. These allegations state a plausible claim that Dixon suffered from a serious medical condition from the date that he injured his achilles tendon through the date that he underwent surgery to repair the tendon. *See, e.g.*, *Brock v. Wright*, 315 F.3d 158, 163 (2d Cir. 2003) (reversing district court's determination on a motion for summary judgment that pain that fell somewhere between

13

"annoying" and "extreme" was not objectively serious and noting that the court does not "require an inmate to demonstrate that he or she experiences pain that is at the limit of human ability to bear, nor do we require a showing that his or her condition will degenerate into a life-threatening one"); *Hemmings v. Gorczyk*, 134 F.3d 104, 108–09 (2d Cir. 1998) ("Hemmings has alleged facts that could potentially show, upon further development, that his" injury involving a ruptured achilles tendon "was sufficiently painful to satisfy the objective prong of the deliberate indifference test under the Eighth Amendment.")

### b.   Subjective Component - Nurse Hitte

Dixon alleges that Nurse Hitte examined him immediately after he injured his ankle playing basketball and provided him with crutches and a bag of ice but did not contact the on-call physician about his injury or provide him with medication to treat the pain caused by the injury.  Dixon was seen the next morning by Dr. Lupis.  The allegation asserted against Nurse Hitte does not state a claim of deliberate indifference to a serious medical need.  At most, Nurse Hitte, who was allegedly anxious to leave for the day, exhibited negligence in response to Dixon's injury.  Am. Compl. ¶ 18.  The Eighth Amendment claim asserted against Nurse Hitte is dismissed.  *See* 28 U.S.C. § 1915A(b)(1).

### c.   Subjective Component - Nurse Bonnie

Dixon alleges that on September 14, 2020, Nurse Bonnie visited his housing unit, listened to his complaints regarding his ankle injury and recommended that he seek permission to get ice from the medical department.

14

Dixon concedes that an officer subsequently permitted him to get ice and that did reduce some of the swelling in his ankle but did not effectively alleviate the pain. *Id.* ¶ 35.  She also learned how his injury occurred.  The continued swelling and severe pain coupled with the description of how the injury occurred and Plaintiff's inability to bear weight are sufficient to suggest a serious injury and the failure to treat the injury and alleviate the pain state a claim of deliberate indifference to a serious medical need.  The Eighth Amendment claim asserted against Nurse Bonnie will proceed.  *See* 28 U.S.C. § 1915A(b)(1).

### d.    Subjective Component - Nurse Candelario

Dixon alleges that on September 22, 2020, Nurse Candelario examined him in a medical treatment room in his housing unit and assured him that she would call him to the medical department later that day to be evaluated further. Although Nurse Candelario did not call Dixon to the medical department that day, Nurse Good summoned Dixon to the medical department the following day.  The allegation that Nurse Candelario neglected to further evaluate Dixon's injury on for 24 hours, at most, does not state a claim of deliberate indifference to medical need.  At worst, her alleged failure to call Dixon to the medical department after initially examining him on September 22, 2020 constitutes negligence.  The Eighth Amendment claim asserted against Nurse Candelario is dismissed.  *See* 28 U.S.C. § 1915A(b)(1).

### e.    Subjective Component - Dr. Wellington

Dixon alleges that on September 25, 2020, prison officers transported him

15

to UCONN to undergo an MRI.  When he arrived, Dr. Wellington, an orthopedist, examined this right ankle and foot, provided him with a medical boot to wear to protect his foot and ankle, entered an order that Dixon could use a cane instead of crutches to ambulate, and informed Dixon that a hospital staff member would call him soon to undergo the MRI of his ankle and foot.  After waiting two hours to undergo the MRI, prison officials transported him back to MacDougall-Walker.

After an unexplained delay, Medical Staff Member Good arranged for Dixon to return to UCONN on October 15, 2020 to undergo an MRI of his right ankle and foot.

Dixon alleges that after examining him on September 25, 2020, Dr. Wellington concluded that an MRI of Dixon's right foot and ankle was necessary to accurately diagnose the cause of Dixon's symptoms.  Dr. Wellington told Mr. Dixon the MRI would occur soon. Dr. Wellington did not say the MRI would be performed that day. Furthermore, there are no allegations that Dr. Wellington had the ability to schedule an MRI that day. The suggestion that Dr. Wellington was somehow responsible for Dixon's return to MacDougall-Walker before an MRI could be performed that day is speculative.  Even if Dr. Wellington could have and failed to arrange for Dixon's MRI on September 25, 2020, his misfeasance would only constitute negligence. The Eighth Amendment deliberate indifference claim asserted against Dr. Wellington is dismissed.  *See* 28 U.S.C. § 1915A(b)(1).

### f.   Subjective Component - Officer Griswold

Dixon contends that on October 6, 2020, Officer Griswold indicated that she

would make sure to deliver the form authorizing his transport to UCONN for an MRI to Nurse Good. Dixon contends that Officer Griswold "mishandled" the form and it did not reach Nurse Good. On October 8, 2020, Dixon received a duplicate form. Approximately three weeks after he saw Dr. Wellington, on October 15, 2020, prison officials transported Dixon to UCONN for his MRI. The allegations asserted against Officer Dixon do not rise to the level of deliberate indifference. Rather, Dixon has alleged that Officer Griswold was negligent in failing to ensure that the October 6, 2020 authorization form reached Nurse Good in a timely manner. The Eighth Amendment claim asserted against Officer Dixon is dismissed. *See* 28 U.S.C. § 1915A(b)(1).

### g.   Subjective Component - Lupis, Good, Barone, Walker

Dixon alleges that on more than one occasion, he spoke to or submitted written requests or medical grievances addressed to Dr. Lupis, Nurse Good and HSR Coordinator/Nurse Walker about the serious nature of his injury, the fact that it caused him to experience severe and constant pain and his need for surgery to repair the injury. He alleges that he also wrote to Staff Member Barone on one occasion and that his mother spoke to Barone on at least one other occasion about his painful achilles injury and need for corrective surgery. Dixon contends that over a two-month period, despite their awareness of his serious and painful injury, these defendants either ignored his complaints of pain and immobility, and/or refused to provide or arrange for treatment to alleviate his painful injury or to implement the recommendations of an orthopedist pertaining to the

management of the swelling and pain caused by the injury prior to surgery, and/or timely facilitate diagnostic testing of his injury or timely schedule the surgical procedure necessary to correct the tear to his achilles tendon.

The alleged failure to treat his injury and to alleviate his pain is sufficient to constitute deliberate indifference. The Court will permit the claims that defendants Lupis, Good, Walker and Barone were deliberately indifferent to Dixon's serious injury to his achilles tendon and severe pain to proceed for further development of the record.

### 3.    Section 1983 - First and Fourteenth Amendments

Dixon contends that Dr. Lupis and Staff Member Barone retaliated against him in violation of the First and Fourth Amendments[1] by delaying the scheduling of the MRI and the surgical procedure to repair his achilles tendon because his mother exercised her right to free speech by making telephone calls to Barone and the medical department challenging the failure to treat Mr. Dixon's ruptured achilles tendon and attendant pain.   Dixon contends further that HSR Coordinator/Nurse Walker retaliated against him in violation of the First and Fourteenth Amendments by failing to prescribe him any medication or to arrange for the provision of medication or other treatment to alleviate the pain caused by

---

[1]   **The First Amendment provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances" and is applicable to the states through the Due Process Clause of the Fourteenth Amendment.  U.S. Const. amend. I;** *Gideon v. Wainwright*, **372 U.S. 335, 341 & n.4 (1963).**

the injury to his achilles tendon in response to his attempt to exercise his right to the redress of grievances by filing requests for Health Services Review.  He also contends that in delaying the scheduling of the surgical procedure to repair his achilles tendon constituted a denial of his right of access to the courts in violation of the First and Fourteenth Amendments.

### a.    Retaliation – Verbal Complaints by Dixon's Mother

The general rule is that a litigant "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin,* 422 U.S. 490, 499 (1975).  In *Singleton v. Wulff,* 428 U.S. 106 (1976), however, the Supreme Court recognized an exception to this rule.  *Id.* at 115-16.  The Court held that if "third parties are unable to assert their own rights, current litigants are allowed to assert third-party claims that might otherwise remain unvindicated."  *Kane v. Johns-Manville Corp.,* 843 F.2d 636, 644 (2d Cir.1988) (citing *Wulff,* 428 U.S. at 115-16).  To have standing to assert the constitutional claims of another, a plaintiff must demonstrate: "(1) injury to the plaintiff, (2) a close relationship between the plaintiff and the third party that would cause plaintiff to be an effective advocate for the third party's rights, and (3) 'some hindrance to the third party's ability to protect his or her own interests.'"  *Camacho v. Brandon*, 317 F.3d 153, 159 (2d Cir. 2003) (quoting *Campbell v. Louisiana*, 523 U.S. 392, 397 (1998)).

Dixon asserts that Dr. Lupis and Staff Member Barone retaliated against him by delaying the scheduling of his MRI and refusing to provide him with

19

medication or treatment to alleviate the pain caused by his injury because of verbal complaints that his mother made to the medical department and about the medical department to Staff Member Barone.  Dixon has alleged facts to satisfy the first and second prongs of *Camacho*: (1) a deprivation of medical treatment for his painful injury and (2) a sufficiently close relationship between himself and his mother that would cause him to be an effective advocate for his mother's rights.  He has asserted no facts, however, to satisfy the third prong.  Dixon does not allege that his mother is incapable of vindicating her own rights.  Thus, the Court concludes that Dixon lacks standing to assert a First Amendment retaliation claim based on a third party's (his mother's) protected speech.  The retaliation claim asserted under the First and Fourteenth Amendments on behalf of Dixon's mother is dismissed without prejudice.  *See* 28 U.S.C. § 1915A(b)(1).

### b.      Retaliation – Dixon's Filing of Grievances

The Second Circuit has "instructed district courts" to consider retaliation claims asserted by prisoners "'prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.'" *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (quoting *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir. 2003)).  Retaliation claims "stated in wholly conclusory terms" are insufficient.  *Id.* (internal quotation marks and citations omitted).

To plead a First Amendment retaliation claim, an inmate must plausibly

20

allege that: (1) his or her speech or conduct was protected, (2) that the prison official engaged in action that was adverse to him or her, and (3) that the protected speech or conduct was causally connected to the adverse action. *Dolan*, 794 F.3d at 294 (internal quotation marks and citation omitted).  The Second Circuit defines an adverse action as "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Davis,* 320 F.3d at 353 (citations and internal quotation marks omitted).

"The filing of prison grievances is a protected activity" under the First Amendment.  *Brandon v. Kinter*, 938 F.3d 21, 40 (2d Cir. 2019) (citation omitted).  Dixon alleges that he filed a request for Health Services Review on October 1, 2020 seeking diagnostic testing and medication or other treatment for his painful injury.  The filing of the medical grievance meets the first prong of a retaliation claim.

On October 30, 2020, in response to the request for Health Services Review, Walker noted Dixon underwent an MRI of his right ankle and foot on October 1, 2020 and marked the request – "No Further Action."  On October 31, 2020, Dixon filed a request for Health Services Review regarding the failure of HSR Coordinator/Nurse Walker to address his request for treatment of the pain caused by the injury to his achilles tendon.  He does not allege that he received a response to this request.

Dixon's allegation that HSR Coordinator/Nurse Walker neglected to arrange

for or provide him with treatment to manage the pain caused by the injury to his achilles tendon in response to his medical grievance arguably constitutes adverse conduct.  Thus, the second element of a retaliation claim has been met.

However, Dixon has not asserted facts to meet the third element.  The Second Circuit as well as other district courts within the Circuit have observed that "'it is difficult to establish one defendant's retaliation for complaints against another defendant.'" *Davis v. Jackson*, No. 15-CV-5359 (KMK), 2018 WL 358089, at *11 (S.D.N.Y. Jan. 8, 2018) (quoting *Hare v. Hayden,* No. 09-CV-3135, 2011 WL 1453789 at *4 (S.D.N.Y. Apr. 14, 2011) and citing *Wright v. Goord,* 554 F.3d 255, 274 (2d Cir. 2009) (dismissing retaliation claim against a corrections officer when the only alleged basis for retaliation was a complaint about a prior incident by another correctional officer); *Jones v. Fischer*, No. 10-CV-1331, 2013 WL 5441353, at *21 (N.D.N.Y. Sept. 27, 2013) (dismissing the plaintiff's retaliation claims and noting such claims "have been dismissed when they are supported only by conclusory allegations that the retaliation was based upon complaints against another officer"); *Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 369 (S.D.N.Y. 2011) (finding the plaintiff failed to provide any basis to believe that a defendant would retaliate for a grievance in which the defendant was not named)).

Dixon's October 1, 2020 request for Health Services Review was based on the inadequate treatment he received from medical staff other than Walker.  The fact that Walker ignored or neglected to acknowledge his request seeking treatment to alleviate the pain caused by his injury until surgery could be

performed does not demonstrate retaliation by Walker for Dixon's filing a grievance regarding the conduct of other defendants.   Rather, Walker's deficient response may constitute deliberate indifference to his serious medical condition. Similarly, any failure by Walker to respond to Dixon's follow-up request for Health Services Review dated October 31, 2020, seeking treatment for the pain caused by the injury to his achilles tendon could also be construed as deliberate indifference to a serious medical need.   The Court has addressed these allegations against Walker in the prior section of this ruling.   Accordingly, the retaliation claim asserted under the First and Fourteenth Amendments based on Dixon's requests for a Health Services Review is dismissed.   *See* 28 U.S.C. § 1915A(b)(1).

### c.   Section 1983 – Access to Courts

Dixon contends that the defendants' conduct in delaying his surgical procedure in response to his mother's complaints and the grievance that he filed violated his right of access to the courts under the First and Fourteenth Amendments.  It is well settled that inmates have a "constitutional right of access to the courts." *Bounds v. Smith*, 430 U.S. 817, 828 (1977), *modified on other grounds, Lewis v. Casey*, 518 U.S. 343, 350 (1996).[2]  The "right of access to the courts," requires States "to give prisoners a reasonably adequate opportunity to

---

[2]  The Supreme Court has "grounded the right of access to courts in the Article IV Privileges and Immunities Clause . . . the First Amendment Petition Clause . . . the Fifth Amendment Due Process Clause . . . and the Fourteenth Amendment Equal Protection . . . and Due Process Clauses." *Christopher v. Harbury*, 536 U.S. 403, 415 n.12 (2002) (citations omitted).

present claimed violations of fundamental constitutional rights to the courts." *Bounds*, 430 U.S. at 825.

To state a claim for denial of access to the courts, an inmate is required to demonstrate that he suffered an actual injury as a result of the conduct of the defendants. *Lewis*, 518 U.S. at 351-53. To establish an actual injury, an inmate must allege facts showing that the defendant took or was responsible for actions that hindered his efforts to pursue a "nonfrivolous" legal claim. *Harbury*, 536 U.S. at 414-15 ("Whether access claim turns on a litigating opportunity yet to be gained or an opportunity already lost . . . plaintiff must identify a 'nonfrivolous,' 'arguable' underlying claim" that he sought to pursue or seeks to pursue in court) (quoting *Lewis*, 518 U.S. at 353 & n.3)).

Dixon asserts no facts to suggest that the defendants delay of the surgery to repair his achilles tendon in retaliation for his medical grievance and his mother's complaints about his medical treatment deprived him of the opportunity to raise a non-frivolous claim or otherwise prejudiced a civil or criminal matter. Because Dixon has not met the injury requirement in *Lewis*, the claim that the defendants violated Dixon's right of access to the courts under the First and Fourteenth Amendments is dismissed. *See* 28 U.S.C. § 1915A(b)(1).

### 4.    Section 1983 – Official Capacity Relief

Dixon sues the defendants in their individual and official capacities and seeks compensatory and punitive damages and injunctive relief. To the extent that Dixon seeks monetary relief from the defendants in their official capacities,

24

those requests are barred by the Eleventh Amendment. *See Kentucky v. Graham*, 473 U.S. 159 (1985) (Eleventh Amendment, which protects the state from suits for monetary relief, also protects state officials sued for damages in their official capacity); *Quern v. Jordan*, 440 U.S. 332, 342 (1979) (Section 1983 does not override a state's Eleventh Amendment immunity). Accordingly, the requests seeking compensatory and punitive damages for violations of Dixon's federal constitutional by the defendants in their official capacities are dismissed under 28 U.S.C. § 1915A(b)(2).

Dixon seeks injunctive relief in the form of an order directing the defendants to provide him with adequate, meaningful, and timely post-operative care and rehabilitative therapy. ECF No. 9 at 12, 15. An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010) (citation omitted). To warrant preliminary injunctive relief, the moving party must demonstrate (a) that he or she will suffer "irreparable harm" in the absence of an injunction, and (b) either (1) a "likelihood of success on the merits or (2) sufficiently serious questions going to the merits [of the case] to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting preliminary injunctive relief." *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 405-06 (2d Cir. 2011) (internal quotation marks omitted). If a party seeks a permanent injunction, he or she "must demonstrate (1) irreparable harm ... and (2) actual success on the merits." *Ognibene v. Parkes*, 671 F.3d 174, 182 (2d Cir.

2012).  Thus, the standard for a permanent injunction is similar to the standard for a preliminary injunction, but a plaintiff must show actual success rather than a likelihood of success.  *See Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n.12 (1987).

Dixon does not describe the post-operative care, treatment or therapy allegedly recommended by the surgeon who, on December 3, 2020, performed the procedure to repair his torn achilles tendon.  Nor does he allege that after he underwent surgery, any defendant denied him post-operative care or physical therapy.

Because Dixon must demonstrate actual success on the merits of the Eighth Amendment claim that proceeds against the defendants in this case to obtain injunctive relief, the relief requested must relate to the allegations asserted in support of that claim.  *See, e.g., Purugganan v. AFC Franchising, LLC*, No. 3:20-CV-00360 (KAD), 2021 WL 268884, at *1–3 (D. Conn. Jan. 27, 2021) ("Success on the merits necessarily refers to the merits of the underlying claims. Accordingly, the Court cannot enjoin AFC based upon alleged conduct that falls outside the scope of the dispute framed by the operative complaint.").  The Court concludes that it would not be appropriate to grant injunctive relief that is unrelated to the allegations asserted in support of his Eighth Amendment claim that pertain to the defendants' failure to provide treatment to alleviate the pain caused by the injury to Dixon's achilles tendon and the defendants' failure to facilitate the timely scheduling of the surgical procedure to repair Dixon's achilles

tendon.  *See, e.g., De Beers Consol. Mines Ltd. v. United States*, 325 U.S. 212, 220 (1945) (preliminary injunction appropriate to grant intermediate relief of "the same character as that which may be granted finally," but inappropriate where the injunction "deals with a matter lying wholly outside of the issues in the suit"); *Torres v. UConn Health*, No. 3:17-cv-00325 (SRU), 2017 WL 3713521, at *2 (D. Conn. Aug. 29, 2017) (preliminary injunctive relief not warranted because claim in motion was unrelated to underlying claims in complaint); *Lebron v. Armstrong*, 289 F. Supp. 2d 56, 61 (D. Conn. 2003) (denying inmate's request for injunctive relief because, *inter alia*, it was based on allegations that were different and unrelated to the facts pled in the underlying complaint).  Accordingly, the request for injunctive relief pertaining to the provision of adequate, meaningful, and timely post-operative care and rehabilitative therapy is dismissed.  *See* 28 U.S.C. § 1915A(b)(1).

### 5.   State Law Claims – Injunctive Relief

Dixon asserts claims that the defendants violated his rights under the Connecticut Constitution and engaged in conduct that constituted the torts of NIED and IIED.  The Court construes these claims as asserted against the defendants in their individual and official capacities.

To the extent that Dixon seeks injunctive relief from the defendants in their official capacities for violations of his rights under the Connecticut Constitution and for engaging in conduct that constituted NIED and IIED under Connecticut law, the request for injunctive relief is barred by the Eleventh Amendment.

*See Vega v. Semple*, 963 F.3d 259, 283-84 (2d Cir. 2020) (holding plaintiff's claims for "prospective relief against Defendants in their official capacity for violations of the Connecticut Constitution and state law ... are indeed barred by the Eleventh Amendment under the *Pennhurst* doctrine.") (internal quotation marks omitted). The claim seeking injunctive relief associated with the torts of NIED and IIED and violations of the Connecticut Constitution are dismissed.   *See* 28 U.S.C. § 1915A(b)(1).

### 6.   State Law Constitutional Claims – Monetary Relief

Dixon contends that the defendants violated his rights under Article First §§ 4, 5, 10 and 14 of the Connecticut Constitution.   Article First, § 4 of the Connecticut Constitution provides: "Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty." Conn. Const. art. 1 § 4.   Article First, § 5 provides: "No law shall ever be passed to curtail or restrain the liberty of speech or of the press." Conn. Const. art. 1, § 5.   Article First, § 10 provides: "All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay." Conn. Const, art. 1, § 10.   Article First, § 14, provides that "[t]he citizens have a right, in a peaceable manner, to assemble for their common good, and to apply to those invested with the powers of government, for redress of grievances, or other proper purposes, by petition, address or remonstrance."

### a.   Article First, Sections 4, 14

28

In *Lopez v. Smiley*, 375 F. Supp. 2d 19 (D. Conn. 2005), the court acknowledged that the Connecticut Supreme Court recognizes a private right of action under Article First, §§ 4 and 14 for declaratory or injunctive relief but noted the absence of Connecticut state court cases recognizing a private right of action for money damages under these sections. *Id.* at 24 n.2 (collecting cases). The court declined to "exercise[e] supplemental jurisdiction over all of Mr. Lopez's Connecticut constitutional claims (both those seeking monetary damages and those seeking injunctive or declaratory relief)." *Id.* at 26.

A review of cases filed since the decision in *Lopez* reflects no case in which a Connecticut court has recognized a cause of action for monetary relief under either Article First, § 4 or § 14. *See, e.g.*, *Sheppard v. Roberts*, No. 3:20-CV-875 (VAB), 2020 WL 6119422, at *12 (D. Conn. Oct. 16, 2020) ("With respect to the remaining state constitutional provisions cited by Mr. Sheppard—*i.e.*, Article first, sections 4, 5, 14, and 20—the Connecticut Supreme Court has not yet recognized a private right of action."); *Richard v. Strom*, No. 3:18-CV-1451 (CSH), 2019 WL 2015902, at *5–6 (D. Conn. May 7, 2019) ("Absent clear recognition of a private right of action under section 14, cases in both this district court and the Connecticut Superior Court have declined to recognize one.") (collecting cases). *Marshall v. Town of Middlefield*, No. 3:10-cv-1009(JCH), 2012 WL 601783, at *9 (D. Conn. Feb. 23, 2012) ("The court finds no cases in which a Connecticut court has recognized a private right of action for money damages under either section four or twenty and multiple cases in which courts have expressly declined to

recognize such claims."); *Wylie v. West Haven*, No. CV065006403, 2010 WL 2196493, at \*3 (Conn. Super. Ct. Apr. 21, 2010) ("there is no recognized private right of action under Article first, § 14."); *Torres v. Armstrong*, No. CV990427057S, 2001 WL 1178581, at \*5-\*7 (Conn. Super. Ct. Sept. 6, 2001) (refusing to recognize prisoner's claims for money damages and injunctive relief brought directly under Article first, §§ 1, 4, 8, 9, 14 and 20 of the Connecticut Constitution).  Nor has the Court discovered any Connecticut cases recognizing a retaliation claim asserted directly under Article First, § 4.[3]

The Court declines to exercise supplemental jurisdiction over any claim asserted under Article First, § 4 or § 14 of the Connecticut Constitution and dismisses the claims without prejudice.  *See* 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if ... the claim raises a novel or complex issue of State law."); *Kolari v. N.Y.–Presbyterian Hosp.,* 455 F.3d 118, 124 (2d Cir. 2006) (favoring principle that "state-law claims raising unsettled questions of law" should be dismissed without prejudice under 28 U.S.C. § 1367(c)(3), and collecting cases).

b.    Article First, Section 5

The Connecticut Supreme Court has held that Article First, § 5 "literally

---

[3]   "Connecticut courts have rejected the argument that the free speech provisions of the Connecticut Constitution are independently actionable apart from a cause of action [for discharge or discipline in retaliation for the exercise of free speech] that is prescribed under § 13-52q." *Jennings v. Town of Stratford*, 263 F. Supp. 3d 391, 409 (D. Conn. 2017) (citing *Thibault v. Barkhamsted Fire Dist.,* No. CV136008093S, 2013 WL 6038259, at \*5 (Conn. Super. Ct. Oct. 21, 2013)); *Blue v. Carbonaro*, No. CV146015705S, 2015 WL 3555294, at \*21 (Conn.

applies only to the passage of laws restraining freedom of speech or press and does not by its terms afford protection provided by § 4 against restrictions the exercise of those rights which government officials may impose whether or not sanctioned by law." *Cologne v. Westfarms Associates,* 192 Conn. 48, 63 (1984). Dixon does not challenge a state statute as being violative of his right to free speech. Thus, he has failed to state a claim of a violation of Article First, § 5 and the claim is dismissed pursuant to 28 U.S.C. § 1915A(b)(1). *See Niblack v. Brighthaupt*, No. CV155035513, 2018 WL 1386211, at *5 (Conn. Super. Ct. Feb. 20, 2018) (dismissing inmate's claim that rejection and return of packages by mail room staff at prison facility violated his right to free speech under Article First, § 5 of the Connecticut Constitution because claim did not relate to the passage of a law restraining freedom of speech and observing that violation of his right to free speech derived from Article First, § 4 of the Connecticut Constitution) (citing *Cologne,* 192 Conn. at 63).

### c.    Article First, Section 10

The Connecticut Supreme Court has held that "Article first, § 10 ... does not itself create new substantive rights but, instead, protects access to [Connecticut state] courts." *Binette v. Sabo*, 244 Conn. 23, 30 (1998). As indicated above, Dixon has asserted no facts to suggest that the defendants denied him access to Connecticut or any other courts.

Furthermore, there are no cases in which a Connecticut court has

Super. Ct. May 11, 2015).

recognized a private right of action under Article I, section 10 of the Connecticut Constitution. *See Sentementes v. General Elec. Co.,* Civil Action No. 3:14–CV–00131(VLB), 2014 WL 2881441, at \*10 (D. Conn. June 25, 2014) (dismissing claim that defendants violated "Article I, section 10 of the Connecticut state constitution . . . [because] Connecticut courts do not recognize a private right of action under that clause"); *Thibault,* 2013 WL 6038259, at \*4 (refusing to "recognize a cause of action for alleged violations of article first, § 10 of the Connecticut constitution"); *Marinella v. Town of Darien,* No. 3:07–cv–910(CFD), 2010 WL 3123298, at \*5 (D. Conn. Aug. 9, 2010) (no cause of action under Article I, sections 8 or 10 of the Connecticut constitution). Accordingly, the Court declines to exercise supplemental jurisdiction over the claim asserted under Article First, § 10 of the Connecticut Constitution and dismisses the claim without prejudice. *See* 28 U.S.C. § 1367(c); *Kolari,* 455 F.3d at 124.

### 7.  State law Tort Claims – Monetary Relief

To state a claim for NIED, a plaintiff must prove that: "(1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress." *Hall v. Bergman*, 296 Conn. 169, 182 n.8, 994 A.2d 666, 674 n.8 (2010) (citation omitted). To state a claim for IIED, a plaintiff must establish four elements: "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress

32

was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Appleton v. Bd. of Educ. of Town of Stonington,* 254 Conn. 205, 210, 757 A.2d 1059, 1062 (2000) (citation omitted).

### a. <u>Official Capacities</u>

To the extent that Dixon asserts claims of NIED and IIED against the defendants in their official capacities, the claims are barred by sovereign immunity.  "The principle that the state cannot be sued without its consent, or sovereign immunity, is well established under" Connecticut law. *DaimlerChrysler Corp. v. L.,* 284 Conn. 701, 711–13 (2007) (citation omitted).  Sovereign immunity applies both to lawsuits seeking monetary damages against the state and to lawsuits seeking monetary damages against state officials in their official capacities. *See Miller v. Egan*, 265 Conn. 301, 313, 828 A.2d 549, 558 (2003) ("a suit against a state officer concerning a matter in which the officer represents the state is, in effect, against the state") (internal quotation marks and citation omitted).

Dixon does not allege that the State of Connecticut has waived sovereign immunity as to claims of NIED or IIED asserted against the defendants in their official capacity.  *Id.* at 314, 828 A.2d at 559 ("to circumvent the doctrine of sovereign immunity" as to a claim for money damages asserted against the state or a state officer in his or her official capacity, a plaintiff must show that the

33

legislature waived the state's immunity) (citation omitted).  Furthermore, absent "a statutory waiver of sovereign immunity, a plaintiff may not bring an action against the state for monetary damages without authorization from the claims commissioner to do so." *Columbia Air Services v. DOT*, 293 Conn. 342, 351, 977 A.2d 636, 644 (2009) (citations omitted).  Dixon does not allege that he sought or received authorization from the Office of the Claims Commissioner to sue the defendants in their official capacities for monetary damages.  Accordingly, the claims seeking money damages from the defendants in their official capacities for NIED and IIED are barred by sovereign immunity and are dismissed.  *See* 28 U.S.C. § 1915A(b)(2).

b.  <u>Individual Capacities - NIED</u>

Conn. Gen. Stat. § 4-165 provides that "[n]o state officer or employee shall be personally liable for damage or injury, not wanton, reckless or malicious, caused in the discharge of his or her duties or within the scope of his or her employment."  Conn. Gen. Stat. § 4–165.  Connecticut courts have held that "wanton, reckless, or malicious" acts go beyond gross negligence, and denote "highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent." *Martin v. Brady*, 261 Conn. 372, 379 (2002) (internal quotation marks and citation omitted).  Accordingly, state employees are not "personally liable for their negligent actions performed within the scope of their employment."  *Miller v. Egan*, 265 Conn. 301, 319 (2003).[1]  It is clear that the defendants were acting within the scope of their

employment during the time period Dixon sought medical treatment for the injury to his achilles tendon.  Accordingly, the claim of that the defendants, in their individual capacities, negligently inflicted emotional distress on Dixon is barred by statutory immunity under Conn. Gen. Stat. § 4-165 and is dismissed.  *See* 28 U.S.C. § 1915A(b)(2).

c.   <u>Individual Capacities - IIED</u>

To be held liable for IIED, one's conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 210–11 (internal quotation marks and citation omitted).  The conduct of the defendants in failing to provide or arrange for medication to alleviate the pain caused by the injury to Dixon's achilles tendon and to timely facilitate diagnostic testing of Dixon's injury and the scheduling of the surgical procedure necessary to correct the tear to Dixon's achilles tendon is not "extreme and outrageous" as those terms are interpreted at common law.  The standard in Connecticut to demonstrate extreme and outrageous conduct is "stringent." *Huff v. W. Haven Bd. of Educ.*, 10 F. Supp. 2d 117, 122 (D. Conn. 1998). "[E]xtreme and outrageous" conduct is defined as that which "exceed[s] all bounds usually tolerated by decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind." *DeLaurentis v. New Haven*, 220 Conn. 225, 267 (1991).  The Court concludes that Dixon has stated a plausible claim that the conduct of Bonnie, Lupis, Good,

Barone, and Walker constituted IIED.  Any IIED claim brought against any other defendant is DISMISSED.  The Court will permit the IIED claim against Bonnie, Lupis, Good, Barone, and Walker to proceed for further development of the record.

II.    <u>Motion for Appointment of Counsel – ECF No. 4</u>

Dixon seeks the appointment of *pro bono* counsel.  Civil litigants do not have a constitutional right to the appointment of counsel.  *See Hodge v. Police Officers*, 802 F.2d 58, 60 (2d Cir. 1986) (district judges are afforded "broad discretion" in determining whether to appoint *pro bono* counsel for an indigent litigant in a civil case); 28 U.S.C. § 1915(e)(1) ("The court *may* request an attorney to represent any person unable to afford counsel.") (emphasis added).

In considering whether to appoint *pro bono* counsel for an indigent litigant, a district court must "determine whether the indigent's position seems likely to be of substance."  *See Hodge*, 802 F.2d at 61.  "[E]even where the indigent [litigant's] claim is not frivolous, counsel is often unwarranted where the [litigant's] chances of success are extremely slim."  *Cooper v. A. Sargenti Co.*, 877 F.2d 170, 171 (2d Cir. 1989); *see also Carmona v. United States Bureau of Prisons,* 243 F.3d 629, 632 (2d Cir. 2001) (denying counsel on appeal where petitioner's appeal was not frivolous but nevertheless appeared to have little merit).  Although the Court has determined that Dixon's Eighth Amendment claims are not frivolous, the Court cannot conclude at this time that Dixon is likely to succeed on the merits of those claims.

Additionally, Dixon has not demonstrated that he has been unable to secure legal assistance or representation on his own.  *See Hodge*, 802 F.2d at 61 (indigent litigant must demonstrate that he or she is unable to obtain counsel or legal assistance independently before a district court will appoint *pro bono* counsel).  He has made no attempts to call or send letters to attorneys who might be willing to represent him in this action or to contact the Inmates' Legal Aid Program ("ILAP").  Although the attorneys at ILAP may not be able to represent Dixon, they may be available to answer questions or provide instruction on how to conduct discovery and to draft motions or memoranda.

Accordingly, the motion for appointment of counsel is denied without prejudice.  Dixon may renew his motion at a later stage of the litigation of the case, after he has made attempts to secure legal assistance and representation independently.

ORDERS

The Court enters the following orders:

(1)     The ADA and RA claims; the request seeking injunctive relief for: violations of Dixon's rights under the First, Eighth and Fourteenth Amendments of the United States Constitution, for violations of Article First §§ 4, 5, 10 and 14 of the Connecticut Constitution, and for conduct constituting the torts IIED and NIED; the First and Fourteenth Amendment retaliation claim based on Dixon's filing of requests for Health Services Review; the First and Fourteenth Amendment access to courts claim; the Eighth Amendment deliberate

indifference to medical needs claims asserted against defendants Hitte, Candelario, Wellington and Griswold; the state law claim for IIED asserted against the defendants in their individual capacities; and the requests for money damages for a violation of Dixon's rights under Article First § 5 of the Connecticut Constitution are DISMISSED pursuant to 28 U.S.C. § 1915A(b)(1).  The First and Fourteenth Amendment retaliation claim asserted on behalf of Dixon's mother is DISMISSED without prejudice pursuant to 28 U.S.C. § 1915A(b)(1).

The official capacity claims for punitive and compensatory damages for violations of the United States Constitution and for IIED—except for the IIED claims against Bonnie, Lupis, Good, Walker, and Barone—and NIED under Connecticut law and the individual capacity claims for punitive and compensatory damages for NIED under Connecticut law are DISMISSED pursuant to 28 U.S.C. § 1915A(b)(2).  The Court declines to exercise supplemental jurisdiction over the claims asserted under Article First §§ 4, 10 and 14 of the Connecticut Constitution and those claims are dismissed without prejudice. *See* 28 U.S.C. § 1367(c).  Accordingly, all claims asserted against Nurses Gwen Hitte, Lisa Candelario and Bonnie, Dr. Wellington and Correction Officer Griswold have been DISMISSED.

The Eighth Amendment deliberate indifference to medical needs claims will PROCEED against Nurse Bonnie; Dr. Francesco Lupis; Custody Staff Member Kristine Barone; Medical Staff Member Holly Good; and HSR Coordinator/Nurse Rose Walker in their individual capacities.

The IIED claims will PROCEED against Nurse Bonnie; Dr. Francesco Lupis; Custody Staff Member Kristine Barone; Medical Staff Member Holly Good; and HSR Coordinator/Nurse Rose Walker in their individual capacities.

The Motion for Appointment of Counsel, [ECF No. 4], is DENIED without prejudice.  Dixon may renew his motion at a later stage of the litigation of the case, after he has made attempts to secure legal assistance and representation independently.

(2)     Within twenty-one (21) days of this Order, the Clerk shall verify the current work addresses of: Nurse Bonnie; Dr. Francesco Lupis, Medical Staff Member Holly Good, Custody Staff Member Kristine Barone and HSR Coordinator/Nurse Rose Walker mail a copy of the amended complaint, this order, and a waiver of service of process request packet to each defendant in his or her individual capacity at his or her confirmed address.  On the thirty-fifth (35th) day after mailing, the Clerk shall report to the Court on the status of the request.  If any defendant fails to return the waiver request, the Clerk shall make arrangements for in-person service by the U.S. Marshals Service and that defendant shall be required to pay the costs of such service in accordance with Federal Rule of Civil Procedure 4(d).

(3)     Defendants Bonnie, Lupis, Barone, Good and Walker shall file their response to the amended complaint, either an answer or motion to dismiss, within sixty (60) days from the date the notice of lawsuit and waiver of service of summons forms are mailed to them.  If the defendants choose to file an answer,

they shall admit or deny the allegations and respond to the cognizable claims recited above.  They may also include any and all additional defenses permitted by the Federal Rules.

(4)     Discovery, pursuant to Federal Rules of Civil Procedure 26 through 37, shall be completed within six months (180 days) from the date of this order. Discovery requests need not be filed with the Court.

(5)     All motions for summary judgment shall be filed within seven months (210 days) from the date of this order.

(6)     If Dixon changes his address at any time during the litigation of this case, Local Court Rule 83.1(c)2 provides that he MUST notify the Court.  Failure to do so can result in the dismissal of the case.  Dixon should write PLEASE NOTE MY NEW ADDRESS on the notice.  If Dixon has more than one pending case, he should indicate all case numbers in the notification of change of address.  Dixon should also inform the attorney for the defendants of his new address.

(7)     Dixon shall utilize the Prisoner Efiling Program when filing documents with the Court.  Dixon is advised that the Program may be used only to file documents with the Court. Local Court Rule 5(f) provides that discovery requests are not to be filed with the Court. Therefore, discovery requests must be served on defendants' counsel by regular mail.

(8)     The Clerk shall send a courtesy copy of the amended complaint and this order to the Connecticut Attorney General and to the DOC Legal Affairs Unit.

(9)     The parties must comply with the District of Connecticut "Standing

40

Order Re: Initial Discovery Disclosures" which will be sent to the parties by the Clerk.  The order also can be found at http://ctd.uscourts.gov/district-connecticut-public-standing-orders.

SO ORDERED.

Dated at Hartford, Connecticut this 24th day of September, 2021.

__/s/_____
Vanessa L. Bryant
United States District Judge